# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DEBORAH N. CRUME,**

        **Plaintiff,**

-vs-                                      **Case No.  6:04-cv-1328-Orl-22JGG**

**METROPOLITAN   LIFE   INSURANCE COMPANY,**

        **Defendant.**

_____

## ORDER

### I.  INTRODUCTION

      Deborah N. Crume sues Metropolitan Life Insurance Company ("MetLife") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking to recover benefit payments under an employer-provided group long-term disability policy.  MetLife has moved for summary judgment.  After carefully considering the parties' submissions, the Court determines that MetLife is entitled to judgment as a matter of law on Crume's claims.

### II.  BACKGROUND FACTS

      Crume was employed as an outside sales representative for Unisource Worldwide, Inc. ("Unisource").  She had worked in that (or a similar) capacity for Unisource, or its predecessor, Georgia-Pacific Corporation, since 1981.  By virtue of her employment, Crume was covered under the Unisource Flexible Benefits Program ("the Plan"), which included a long-term disability component.

Crume's last day at work was July 25, 2003.  The next day, Crume attempted suicide by taking an overdose of over-the-counter medication.  She was hospitalized for several days, during which she was involuntarily committed to a psychiatric ward pursuant to Florida law.[1] Crume was released on July 30, 2003 with a diagnosis of major depression.

In early August 2003, and continuing thereafter, Crume received treatment from her psychiatrist, Dr. Alan Berns, whom she had been seeing prior to her suicide attempt.  Dr. Berns eventually diagnosed Crume with bipolar disorder.  Prior to Crume's hospitalization, Dr. Berns had diagnosed Crume as suffering from major depression.  Crume also received counseling from psychologist Dr. Sharon Thetford during August and September of 2003, then switched to another psychologist, Dr. Wendy Esko-Fisher, for further therapy.

On October 15, 2003, Crume made a claim for long-term disability benefits based on bipolar disorder and depression.  Among the documents she submitted to support her claim was an Attending Physician Statement ("APS") prepared by Dr. Berns on October 10, 2003.  A.R. 0169-171.[2]  Therein, Dr. Berns reported a diagnosis of bipolar disorder.  A.R. 0169.[3]  In a section of the APS relating to "Psychological Functions," Dr. Berns reported: "Patient is unable

---

[1]Throughout the claims process, it appears that MetLife consistently erred by stating that Crume had only been hospitalized overnight.  It is unclear how this mistake was induced in the record. However, the difference between one night and three or four nights hospitalization, while certainly significant to Crume, is legally inconsequential to the ultimate question of whether Crume was disabled under the policy.

[2]A copy of the administrative record (cited herein as "A.R.") is attached as Exhibit "B" to the deposition of Carole Roy.  *See* Doc. 53-5 through -14.

[3]Several words appear following "bipolar disorder," but the only one that is legible is the word "depressed."  A.R. 0169.

to engage in stress situations or engage in interpersonal relations (marked limitations)." A.R. 170.  He also indicated that Crume could not return to work because she "cannot tolerate stress, time demands[,] fatigue [and] quotas."  *Id*.

After receiving Crume's claim and supporting documents, MetLife had the file reviewed by one of its medical consultants, Dr. Bettina B. Kilburn, a psychiatrist.  In her report, Dr. Kilburn reviewed and summarized the records of Crume's treating mental health professionals. A.R. 0097-98.  She then provided answers to a series of questions, as follows:

> 1.  Do the medical records objectively support a diagnosis of Bipolar Disorder?  Please explain.
>
> Answer: The available documentation does not offer substantial evidence consistent with a DSM-IV-TR criteria diagnosis of Bipolar Disorder.  There is no clearly defined evidence of manic or hypomanic symptoms.  The claimant has occasionally self-reported mood swings and self-reported "excess energy" on one occasion; however, her reported vegetative symptoms and mood disturbance are consistent with a diagnosis of Major Depression. The claimant has carried the diagnosis of Major Depression through much of her treatment; and there has been no emerging significant change in her clinical picture, which would indicate that she meets diagnostic criteria for Bipolar Disorder.
>
> 2.  Do the medical records objectively support a severity of limitation to preclude this employee from return to work within her own occupation?  Please explain.
>
> Answer: The available documentation does not offer clear, compelling evidence substantiating a significant, measurable, observable, global psychiatric impairment which would preclude the patient's performance of the tasks of her occupation as a sales representative.  She has been reasonably stable following her brief crisis hospitalization in July 2003.  There is scant documentation of Mental Status Exam or other objective findings; and Mental Status Exams documented indicate that the claimant is free of suicidal ideation, homicidal ideation, cognitive deficits, and difficulty with thought content or thought

processes.  She continues to report depressed mood, which is not in and of itself a defined psychiatric occupational task impairment.  Her AP has decreased the frequency of visits to once monthly, on average, a frequency of psychiatric visits not consistent with define[d] repair of an acute or debilitating psychiatric functional limitation. Records at various points refer to the claimant's "work-related stress[,]" "job stress[,]" and "pressure at work[.]"  While the claimant may experience the demands of her job as stressful, her subjective experience of stress is neither a diagnosis nor a defined impairment.

3.  Based on your review, when might the employee's condition improve to the point of return to work?

Answer: N/A.

4.  Based on your opinion, does this condition appear to be more of a work-related issue rather than a mental/nervous disability? Please explain.

Answer: Please see number two.  The available documentation suggest the primary issue appears to be the claimant's perception of her work setting/job demands as stressful, rather than a defined occupational psychiatric functional limitation.  In her Personal Profile Evaluation, the claimant indicates that she is able to engage in a wide range of activities, including doing house chores, walking, going out to lunch daily with her husband, and providing some care for her parents.  The claimant is able to task shift, respond to others, maintain a schedule, make decisions, process information, and engage with the (at times unpredictable) needs of family members.  All of these abilities correlate with the skills the claimant's Job Description defines as essential to her occupation.

A.R. 0098-99.

On January 13, 2004, MetLife sent Crume a letter notifying her that the company was denying her claim.  A.R. 0092-95.  The letter began by quoting pertinent language from the disability plan, then summarized the Attending Physician Statements submitted by Drs. Berns

and Thetford, and, next, proceeded to discuss Crume's hospitalization following her suicide

attempt. A.R. 0092-93. Continuing, the January 13th letter stated:

> The Personal Profile Evaluation (PPE) you had completed indicated that your daily routine included: waking up at 6 a[.]m[.], taking your dog for a half hour walk, doing chores (laundry, vacuuming, dusting, washing dishes, mopping, and lawn care) around the house, meeting your husband for lunch, watch television, do more chores or visit with your parents (who require some assistance), then prepare dinner and watch more television. You added that you would be interested in returning to work for Unisource, but only with another position that would not have the requirements of outside sales, such as the driving, deadlines, and stress. You also indicated that on a daily basis you exercise, walk, enjoy movies, television, and are active with your family and your mother's care (medical appointments and visitation).

> In order to give your claim every possible consideration, we referred your claim to a Board Certified Independent Physician Consultant (IPC), specializing in Psychiatry, for review. The IPC reviewed your medical records from Dr. Berns who indicated that you had been under his treatment since June 2002. All available notes focus on your self-reported symptoms and your processing of psychosocial stressors in your life. At various times in your treatment, you reported dysphoria, anxiety, decreased appetite, difficulty concentrating, panic attacks, and suicidal ideation. You noted stressors included [sic] your work pressure and your daughter's drinking. However, Dr. Berns did not mention any Mental Status Exam, Mini-Mental Status Exam, or any other defined objective findings. The IPC noted that your chief complaint after being discharge[d] from Orlando Regional Healthcare System was job stress, but you were cooperative while maintaining eye contact, with a calm mood and affect, and you denied homicidal and suicidal ideation.

> The IPC also reviewed your medical records from Dr. Thetford. Dr. Thetford confirmed that last date of treatment as September 24, 2003. Your notes described your subjective complaints as guilt, worry, low motivation, decreased sleep, diminished interests, sadness, and crying[;] however, again, there were no objective findings noted. Dr. Thetford indicated that the reason

your treatments were discontinued was that you found treatment elsewhere.

After a thorough review of all your medical records, the IPC indicated that the available documentation does not offer substantial evidence consistent with a DSM-IV-TR criteria diagnosis of Bipolar Disorder.  There was no clearly defined evidence of manic or hypomanic symptoms.   You had occasionally self-reported mood swings and "excess energy[;]" however, your reported vegetative symptoms and mood disturbance are consistent with a diagnosis of major depression. In addition, you carried the diagnosis of major depression through much of your treatment; and there has been no emerging significant change in your clinical picture, which would indicate that you meet diagnostic criteria for bipolar disorder. Furthermore, the IPC added that the available documentation does not offer clear, compelling evidence substantiating a significant, measurable, observable, global psychiatric impairment which would preclude you from performing the tasks of your occupation as a sales representative.  The IPC noted that you have been reasonably stable following your brief crisis hospitalization in July 2003.  There is scant documentation of a Mental Status Exam or other objective findings; and Mental Status Exams documented indicate that you were free of suicidal and homicidal ideation, cognitive deficits, and of difficulty with thought content or thought processes.  You continued to report depressed mood, which is not in and of itself a defined psychiatric occupational task impairment.   Your treating physician has decreased your frequency of visits to once a month.  Your frequency of psychiatric visits is not consistent with defined repair of an acute or debilitating psychiatric functional limitation.  There were numerous records referring to "work-related stress[,]" "job stress[;]" and "pressure at work[.]" While you may perceive the demands of your job as stressful, your subjective experience of stress is neither a diagnosis nor a defined impairment.

The IPC concluded by indicating that your medical records suggest that the primary issue appears to be your perception of your work setting/job demands as stressful, rather than a defined occupational psychiatric functional limitation.  Your Personal Profile indicated that you are able to engage in a wide range of activities, including doing house chores, walking, going out to

-6-

lunch daily with your husband, and providing some care for your parents. You are able to task shift, respond to others, maintain a schedule, make decisions, process information, and engage with the (at times unpredictable) needs of family members. All of these abilities correlate with the skills of your occupation.

In summary, the review of your claim and medical records revealed no significant measurable, global psychiatric impairment precluding you from performing the tasks of your occupation. Your PPE indicated your ability to perform an active schedule on a daily basis. This is inconsistent with someone who has a psychiatric impairment that would preclude you from your occupation.

In order to be eligible for disability benefits, you must provide proof that you were disabled from your own occupation, through the entire elimination period. Based on the information received from your physicians, the IPC review, and your PPE you were not disabled throughout the entire elimination period. Your medical records and the IPC review concur that you stopped working due to a [sic] stress at work and not due to a psychiatric impairment. Your occupation is not limited to the specific position that you held with Unisource. If taken out of your work environment, you would have been able to work within your occupation, with another employer. The activity level in your file indicates that you remain very active in your life and are not suffering from a condition of such a severity that would preclude you from your own occupation.

Therefore, since there have been no medical records submitted to substantiate a psychiatric impairment throughout the entire elimination period, and you did not meet the definition of disability for Long-Term Disability, your claim has been denied.

A.R. 0093-95. The letter concluded by notifying Crume of her appeal rights. A.R. 0095.

Crume began working again in early February 2004, as an inside sales customer service representative for Redd Paper Company. Her income in that position was substantially less than she earned as an outside sales representative at Unisource. By that time, Crume had retained a lawyer to represent her in connection with her disability claim. Crume's attorney wrote

MetLife seeking documents to assist him in evaluating Crume's claim and for the purpose of preparing an administrative appeal.  A.R. 0088-89.

Following receipt of the document request, MetLife arranged to have Crume's claim file reviewed by another psychiatrist, Dr. Mark Schroeder.  In his report to MetLife, Dr. Schroeder answered the question, "Does the available medical documentation furnished for review substantiate psychiatric impairment that would result in functional limitations precluding the employee from performing the functions of own occupation as of 8/1/03 onward?," by stating:

> The available medical documentation does not substantiate psychiatric impairments that would result in functional limitation precluding the employee from performing the functions of her own occupation as of 8/1/03.  The record does indicate that the employee had taken an overdose of medication leading to a psychiatric hospitalization from 7/29/03 to 7/30/03.  The discharge summary from this hospitalization noted that the employee attributed this attempt to "work related stress[.]"  The employee's mental status examination was described as fully within normal limits in the hospital.  The assessment at the Esko Counseling Center noted a mental status examination essentially fully within normal limits, and noted the employee's report that the hospitalization "came from pressure at work[.]"

> The records of Dr. Thetford and Dr. Berns indicate the employee's self-reported symptoms of depression and anxiety, and apparently on one occasion mood swings, racing thoughts and excess energy.  These records do not contain evidence of severe psychiatric symptoms, such as active suicidal or homicidal thoughts, psychotic symptoms or any observed manic or hypomanic symptoms. These records do not contain objective evidence of psychiatric functional impairment.  For example, although Dr. Berns stated that the employee had difficulty concentrating, it was not stated whether this statement was based on the employee's self-report or the psychiatrist's observation, or if it was observed, how it was assessed or measured.

> In the personal profile, the employee indicated performing an essentially full[4] range of daily activities, including helping care for her aging parent. The employee also noted that she could not work because of the stress of work, and that she did not plan to return to her previous job because she did not like the stress, the driving and the deadlines, but would consider another job in the company.
>
> In sum, the claim provides evidence of a brief hospitalization in late July 2003 that was attributed by the employee to work stress. Subsequent office notes provide only subjective reports of anxiety and mood symptoms, without objective corroboration. The employee's own self-report indicates essentially full functionality.

A.R. 0148D-E (footnote added).

On March 23, 2004, after receiving Dr. Schroeder's report, MetLife sent Crume's attorney a letter notifying him that the company was upholding its original claim denial determination. A.R. 0149-51. The letter quoted relevant policy provisions, then summarized Dr. Schroeder's report, and concluded: "The medical documentation on file does not provide evidence that Ms. Crume was precluded from performing the duties of her own job and therefore own occupation as of December 30, 2003. Consequently, this period out of work is not eligible for Disability Benefits." A.R. 0150.

After receiving the March 23rd letter, Crume's attorney wrote MetLife and pointed out that he had not yet submitted an administrative appeal request on his client's behalf, but that he planned to do so. A.R. 0103. MetLife responded by indicating it would proceed with the appeal process once Crume's counsel had submitted all of the documentation he wished to have

---

[4]The word "full" has been handwritten in this sentence. A.R. 0148D.

considered on appeal.  A.R. 0104.  Crume's appeal request was submitted by letter dated May 24, 2004.  A.R. 0105-112.

After receiving the appeal letter, MetLife arranged for yet another review by a consulting psychiatrist, Dr. Leonard Kessler.  MetLife procedural analyst Carole Roy posed the following inquiries to Dr. Kessler: "Does the medical information on file support the functional limitations and the claimant's inability to function?;" "Does the medical information submitted in this file support any restrictions and/or limitations beyond 12/30/03?;" "Does the medical information support a psychiatric impairment beyond 12/30/03?;" "Was the claimant receiving appropriate care and treatment?;" and "Based upon the documentation reviewed, please offer an opinion of the employee's functional abilities."  A.R. 0159-60.

In his report to the insurer, Dr. Kessler stated, in pertinent part:

> This [redacted] married mother of a [redacted] daughter left work, as a Sales Representative, on 7/25/2003 and returned to work, for another employer, on 2/2/2004.  She had alleged disability based upon diagnosed Major Depressive Disorder. This diagnosis was made by Dr. Thetford as well as Dr. Berns on his initial evaluation of 6/19/02.  The diagnosis of Major Depressive Disorder was also made by Dr. Singh on 8/4/03 at the time of the claimant['s] very brief hospitalization.  The rationale for Dr. Berns' change of diagnosis, on 10/10/03, to Bipolar Disorder has not been provided.  There is, thus, no support, in terms of history and objective mental status findings, for the diagnosis of Bipolar Disorder relative to DSM IV diagnostic criteria.  A diagnosis of Post Traumatic Stress Disorder made by Dr. Thetford has not been supported by history and mental status observation.  The claimant clearly left work in response to work conflicts and Dr. Singh wrote that "There is a lot of work-related stress.  She did not know how to handle it and ended up taking a whole lot of pills . . . " When evaluated by Dr. Esko Fisher on 10/14/03 she reported that her depressive symptoms were: "States it came from pressure at work[.]" The claimant reported that "Because of the high stress

involved in outside sales and all it's [sic] requirements I don't feel I can handle going back to work and it's [sic] pressures." She further reported that "I do not plan to return to outside sales. I cannot handle the stress, the driving and the deadlines."  The claimant has been seeing Dr. Berns, for twenty minute visits focus[ed] entirely upon symptom relief, since June 2002, and saw Dr. Thetford briefly from 8/13/03 to 9/24/03, following which she was treated, from 10/14/03, by Dr. Esko Fisher. Progress notes through the end of 2003 did not show impairment in memory, attention, concentration, or social interaction.  The claimant reported being active in many areas including ability to care for herself, cook, drive, exercise, attend movies, eat in restaurants, walk, and care for her home.  She also noted a body weight of 170 pounds with height of 5' 4" suggesting a diagnosis of Obesity which has not been made or treated.  A mental status examination performed on 10/14/03, by Dr. Esko Fisher, showed the claimant to be relevant, oriented, with no impairment of recent or remote memory, having normal speech, and dysphoric effect.

**QUESTIONS POSED AND ANSWERS:**
The claimant left work in response to work conflicts and pressures she perceived from her job.  She did not initiate any psychiatric treatment, aside from medications prescribed by Dr. Berns, including Depakote, Celexa, and Trileptal, until 8/13/03.[5]

---

[5]Crume has called into question the accuracy of Dr. Kessler's statement that, following her last day at work, Crume did not initiate any psychiatric treatment until August 13, 2003.  Crume maintains that she attended a "family session" on July 30, 2003 while she was hospitalized; that she underwent a psychiatric evaluation/initial treatment plan on either July 30 or August 4, 2003; and that she saw Dr. Berns in his office on August 5, 2003.  Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 59) at 15 n.10.  The administrative record supports Crume's position.  *See* A.R. 0081, 0076-78 & 0049.  However, Dr. Kessler's report specifically references the "Psychiatric Evaluation by Dr. Sanjeev Singh, MD, dated 8/4/03," A.R.  0076-78, which is the report of the psychiatric evaluation/initial treatment plan.   Kessler Report, A.R. 0157.  Hence, it appears Dr. Kessler took this particular information into account.  This leaves the family session and the office visit with Dr. Berns on August 5, 2003.  MetLife seeks to explain this apparent discrepancy by stating that Dr. Kessler "appears to be focused on Plaintiff's lack of actual psychiatric or psychological therapy at a point prior to August 2003."  Defendant's Motion for Summary Judgment (Doc. 52) at 9 n.1.  It is not necessary for the Court to assess the validity of this purported justification.  Whether Crume received psychiatric treatment while she was in the hospital, or, after her release, saw Dr. Berns again on August 5, 2003, or did not see him again until August 13, 2003, is inconsequential to

> The medical documentation does not show the presence of a severe psychiatric disorder beyond 12/30/2003 nor support for a need for restrictions. The diagnosis of Bipolar Affective Disorder has not been supported relative to DSM IV criteria nor has it been supported by three other treatment providers. Treatment has consisted largely of symptom focused medication with very limited therapy and no treatment plan provided to address relevant occupational issues. The claimant had reported ability to manage daily activities and there is no evidence showing marked and sustained functional limitations beyond 12/30/03.

A.R. 0157-58 (footnote added).

On June 18, 2004, MetLife wrote Crume's attorney and stated it was upholding its original claim denial decision. A.R. 0152-55.[6] After quoting relevant policy provisions, the June 18th letter stated:

> We have reviewed your client's entire claim file. The documentation in her file indicated that her employer had employed her since December 29, 1981. She held the position of Sales Representative prior [to] the last day worked of July 25, 2003.
>
> The medical documentation on file reflects her diagnoses are Major Depressive Disorder, Bi-Polar Disorder, and Post-Traumatic Stress Disorder. The determination of disability is not determined solely by diagnoses, but is based on functional ability supported by clinical evidence that would substantiate symptoms consistent with those reported by the patient and medical providers. In this determination of disability, we must take into consideration current restrictions and limitations that are supported by clinical evidence that substantiates an inability

_____

the ultimate question of whether Crume was disabled under the policy.

[6]The second page of the June 18th letter in the administrative record is blank. A.R. 0153. Because the letter appears to "flow" logically from A.R. 0152 to A.R. 0154, it appears the blank page is the result of a copying error and that none of the pages of the June 18th letter are actually missing.

to perform each of the material duties of her regular occupation in accordance with the Plan.

On June 16, 2004, a board-certified physician in Psychiatry reviewed Ms. Crume's entire claim file.  The medical information reviewed was the documentation contained in her file as well as the information submitted with her appeal.  The review found that Dr. Thetford and Dr. Berns (on his initial evaluation on June 19, 2002) originally diagnosed Ms. Crume with Major Depressive Disorder.  Dr. Singh also agreed with this diagnosis on August 4, 2003.  This was due to her brief hospitalization.  In the notes, we found that Dr. Singh wrote, "There is a lot of work-related stress.  She did not know how to handle it and ended up taking a whole lot of pills . . ."  On October 10, 2003, Dr. Berns' [sic] changed her diagnosis to Bipolar Disorder[;] however, he did not support (in terms of history and objective mental status findings) this change, per DSM IV diagnostic criteria.  Dr. Thetford also made a diagnosis of Posttraumatic Stress Disorder[;] however, he [sic] also failed to support this diagnosis by not providing the history and a mental status observation.

On October 14, 2003, Dr. Esko Fisher reported that Ms. Crume's depressive symptoms were "States it came from pressure at work."  The mental status examination completed by Dr. Fisher on October 14, 2003, showed Ms. Crume to be relevant, oriented, with no impairment of recent or remote memory, having normal speech, and dysphoric effect.  Ms. Crume reported that "Because of the high stress involved in outside sales and all it's [sic] requirements I don't feel I can handle going back to work and it's [sic] pressures."  She further reported that "I do not plan to return to outside sales.  I cannot handle the stress, the driving and the deadlines."

We found that the progress notes through the end of 2003 did not show impairments in memory, attention, concentration, or social interaction.  We also found that Ms. Crume reported being active in many areas including ability to care for herself, cook, drive, exercise, attend movies, eat in restaurants, walk, and care for her home.  Therefore, the review failed to locate documentation to substantiate a medical condition that was of a severity as to prohibit her from performing the material duties of her occupation (as a Sales Representative).   As such, the

> determination to deny her disability benefits is in accordance
> with the Plan.  She has exhausted her administrative remedies
> under the plan[;] no further appeals will be considered.

A.R. 0154.

This lawsuit ensued.

### III.  PLAN PROVISIONS[7]

#### A.  Provisions Regarding MetLife's Discretion

The Plan contains two clauses granting MetLife discretion.  The first is contained in the

Certificate of Insurance portion of the Plan.  It states: "MetLife in its discretion has authority

to interpret the terms, conditions, and provisions of the entire contract.  This includes the Group

Policy, Certificate and any Amendments."  Unisource LTD Plan 0003.  The second provision

is contained in a portion of the Plan entitled "Claims Information."   It reads as follows:

> In carrying out their respective responsibilities under the Plan,
> the Plan Administrator and other Plan fiduciaries shall have
> discretionary authority to interpret the terms of the Plan and to
> determine eligibility for and entitlement to Plan benefits in
> accordance with the terms of the Plan.  Any interpretation or
> determination made pursuant to such discretionary authority
> shall be given full force and effect, unless it can be shown that
> the interpretation or determination was arbitrary and capricious.

*Id.* at 0042.[8]

---

[7]A copy of the Plan is attached as Exhibit "A" to the deposition of Carole Roy.  *See* Doc. 53-4.

[8]The Plan lists Unisource as the employer and plan administrator.  Unisource LTD Plan 0040.
However, Crume concedes that MetLife qualifies as a plan fiduciary.  *See* Plaintiff's Response to
Defendant's Motion for Summary Judgment (Doc. 59) at 9 ("(although not the Plan administrator,
MetLife would be a plan fiduciary as it makes the final decision)").

### B.  Provisions Regarding Disability

The Plan contains the following definition of disability:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2. after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.  Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

Unisource LTD Plan 0019.

"Own Occupation" is defined as "the activity that you regularly perform and that serves as your source of income.  It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer."  *Id.* at 0020.

The Plan contains the following explanation of "Elimination Period":

> Your Elimination Period begins on the day you become Disabled.  It is a period of time during which no benefits are payable.  Your Elimination Period is shown in Plan Highlights. You must be under the continuous care of a Doctor during your Elimination Period.  You may temporarily recover from your Disability during your Elimination Period.  If you then become

> Disabled again due to the same or related condition, you may not
> have to begin a new Elimination Period.

*Id.* at 0019.  The Elimination Period is listed as "151 days of continuous Disability."  *Id.* at

0014.

The Plan also limits benefits to 24 months for a "Mental or Nervous Disorder or

Disease," unless the disability results from schizophrenia, bipolar disorder, dementia, or organic

brain disease.  *Id.* at 0027.  The Plan defines "Mental or Nervous Disorder or Disease" as "a

medical condition of sufficient severity to meet the diagnostic criteria established in the current

Diagnostic And Statistical Manual Of Mental Disorders," and adds: "You must be receiving

Appropriate Care and Treatment for your condition by a mental health Doctor."  *Id.*

## IV.  ERISA STANDARD OF REVIEW

The Supreme Court has held that "a denial of benefits challenged under [29 U.S.C.] §

1132(a)(1)(B)[9] is to be reviewed under a *de novo* standard unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989) (footnote added); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) (quoting

*Bruch*).  Expanding on this principle, the Court of Appeals for the Eleventh Circuit  stated in

*Kirwan*:

---

[9]Section 1132(a)(1)(B) authorizes a "participant or beneficiary" to bring a civil action "to
recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the
plan, or to clarify his rights to future benefits under the terms of the plan[.]"

> This circuit has interpreted *Bruch* to mandate *de novo* review unless the plan *expressly* provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms. Thus, this court has applied the arbitrary and capricious standard when the plan provides that the administrator[']s "determinations shall be final and conclusive" so long as they are "reasonable determinations which are not arbitrary and capricious." This court has also applied the arbitrary and capricious standard when the plan confers upon the administrator "full and exclusive authority to determine all questions of coverage and eligibility" and "full power to construe the provision[s]" of the plan. On the other hand, this court has applied the *de novo* standard when the plan confers upon the administrator the authority to make initial eligibility determinations "according to the terms of the Plan."

10 F.3d at 788 (emphasis in original) (footnotes and some internal quotation marks omitted).

If the *de novo* standard applies, a district court reviewing a benefits determination "is not limited to the facts available to the Administrator at the time of the determination." *Kirwan*, 10 F.3d at 789. On the other hand, if the arbitrary and capricious standard applies, "the administrator's fact-based determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997). The arbitrary and capricious standard applies to the administrator's "construction of the plan and concomitant factual findings[.]" *Id.* However, if an administrator who has been granted discretion under the plan has a conflict of interest, a "heightened" arbitrary and capricious standard governs. *Id.* at 1449. Such a conflict of interest exists where a plan is administered by an insurance company which pays benefits out of its own assets. *See, e.g., Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1561-68 (11th Cir. 1990). Under this heightened arbitrary and capricious standard,

-17-

> "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries."

*Godfrey v. BellSouth Telecomms., Inc.,* 89 F.3d 755, 758 (11th Cir. 1996) (quoting *Brown*, 898 F.2d at 1566-67).  This principle is limited by an important precondition:  "'[t]he fiduciary's interpretation first must be "wrong" from the perspective of a *de novo* review[.]'" *Godfrey*, 89 F.3d at 758 (quoting *Brown*, 898 F.2d at 1566 n.12).

In *Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132 (11th Cir. 2004), the Eleventh Circuit outlined a step-by-step analytical process for evaluating ERISA claims.  Under this multi-step approach, a district court must

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision);  if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds  supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

373 F.3d at 1138 (emphasis in original; footnotes omitted).

"In an ERISA benefit denial case [subject to deferential review], . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)[10] (quoted with approval in *Curran v. Kemper Nat. Servs., Inc.*, No. 04-14097, 2005 WL 894840 *7 (11th Cir. Mar. 16, 2005) (unpublished *per curiam* opinion)). Accordingly, "[w]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999);[11] *see also Fish v. Unum Life Ins. Co. of Am.*, No. 6:04-cv-1716-Orl-22JGG, 2005 WL 3186089 * 13 (M.D. Fla. Nov. 29, 2005) (order granting defendant's motion for summary judgment and denying plaintiff's cross-motion) (some footnotes omitted). Judges Whittemore, Presnell and

---

[10]Although the First Circuit did not qualify the foregoing quote, this Court interprets the appellate court's statements as applying to those cases where a plan administrator has been granted discretion, rather than to those subject to *de novo* review.

[11]What this means to the First Circuit is that "the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Leahy*, 315 F.3d at 18.

Kovachevich of this Court have reached the same conclusion in orders addressing summary judgment motions. *See Providence v. Hartford Life & Acc. Ins. Co.,* 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005) (citing *Bendixen*) (Whittemore, J.); *Smorto v. 3DI Techs., Inc.,* 393 F. Supp. 2d 1304, 1313 (M.D. Fla. 2005) (citing *Providence* and *Bendixen*) (Presnell, J.); *Stenner-Muzyka v. Unum Life Ins. Co. of Am.*, No. 8:04-cv-984-T-17TBM, 2005 WL 1610708 *3 (M. D. Fla. Jul. 7, 2005) (citing *Providence* and *Bendixen*) (Kovachevich, J.).

The Court recognizes that the Eleventh Circuit's unpublished *Curran* opinion represents merely persuasive authority, rather than binding precedent, and that reliance on unpublished decisions is ordinarily disfavored. *See* 11th Cir. R. 36-2 and I.O.P. 6. It is also true that there are Eleventh Circuit decisions, including published opinions, which apply the normal summary judgment rules to ERISA benefit denial cases. *See, e.g., Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1277 (11th Cir. 2005) (applying ordinary summary judgment procedures to ERISA benefits claim). However, *Curran* is the only Eleventh Circuit decision of which this Court is aware that confronts this issue in the fashion addressed in *Leahy* and *Bendixen*.[12]

In a case like this, where the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal" summary judgment rules can sensibly apply. After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record

---

[12]However, *Curran* is not completely free from ambiguity. After implying that "the factual review standard applicable to summary-judgment review" is supplanted by the "the deferential review owed to the administrator in an ERISA case," 2005 WL 894840 *7, the appellate court ultimately concluded that Curran "failed to show genuine issues of material facts to preclude summary judgment under the proper review standard," *id.* at *9.

to support the administrator's decision on that point.  In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.  More fundamentally, perhaps, if the "normal" summary judgment rules apply to these kinds of cases, and it is determined that an issue of material fact exists, thereby precluding summary judgment, what is the next step in the case resolution process?  In other kinds of cases, the next step would be a trial.  But what is this Court to "try" when it ordinarily cannot consider evidence outside the administrative record,[13] and the ultimate issue to be determined is whether there is a reasonable basis in that record for the fiduciary's decision?  These considerations lead this Court to believe that unless it receives contrary guidance from the Eleventh Circuit, the proper method of evaluating these cases is as expressed in *Curran, Leahy* and *Bendixen*.

## V.  THE PARTIES' POSITIONS

MetLife asserts that the Plan confers sufficient discretionary authority to trigger the deferential arbitrary and capricious review standard.  Although it is undisputed that MetLife both administers and pays claims under the Plan, MetLife contends the heightened version of arbitrary and capricious review should not be applied because MetLife's final decisionmaker mistakenly believed the applicable plan was funded by Crume's employer, rather than by

---

[13]The Court recognizes that even under abuse of discretion review, there may be some instances when evidence beyond the administrative record (e.g., evidence relevant to a plan administrator's conflict of interest) may be relevant.  *See Cerrito v. Liberty Life Assurance Co. of Boston*, 209 F.R.D. 663, 664 (M.D. Fla. 2002) (in the context of a discovery ruling, identifying purposes for which matters outside the administrative record might be relevant).

MetLife.  If the heightened standard does apply, MetLife argues that the circumstances of this case demonstrate that its claim decision was not tainted by self-interest.

In response, Crume argues that either the *de novo* or heightened arbitrary and capricious standards apply.  Crume maintains that the broader of the two Plan provisions (quoted *supra*) which grant MetLife discretion cannot be applied because it is either not a part of the Plan, or it conflicts with the narrower discretionary language in the Certificate of Insurance, thereby rendering the Plan ambiguous.

On the merits of Crume's disability claim, MetLife argues that the medical records and the opinions of MetLife's three "independent" physician reviewers demonstrate that MetLife's decision was correct, with the result that it is entitled to summary judgment at the very first step in the review process (whether the fiduciary's interpretation is "wrong" from the perspective of *de novo* review).  The company next argues that even if its decision was not legally correct, it was nevertheless reasonable and must be upheld on that basis.  Finally, as previously noted, MetLife contends that even if heightened arbitrary and capricious review applies, it has met its burden of demonstrating that it did not act out of self-interest in denying Crume's claim.

In response, Crume argues that MetLife's decision was both wrong and arbitrary and capricious because the company ignored the opinions of Crume's treating physicians.  Crume also asserts that MetLife acted unreasonably in failing to furnish its medical consultants with one of two job descriptions for Crume's outside sales position.  Crume contends the job description which was not considered more accurately reflected the stress associated with Crume's position.  In Crume's view, "[w]ithout this job description, the physicians could not assess whether, given [Crume's] mental condition, she could perform her own occupation."

Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 59) at 18 (footnote omitted).[14]

## VI. ANALYSIS

### A. Step One: Was MetLife's Decision Wrong?

Simply put, MetLife is entitled to summary judgment at the first analytical step.  From the perspective of *de novo* review, no reasonable fact-finder could conclude that MetLife's decision was wrong.

Previously, Crume had been diagnosed as suffering from major depression.  Dr. Berns later diagnosed Crume as having bipolar disorder.  However, among Crume's mental health providers, Dr. Bern was the only treating provider who made that diagnosis.  As MetLife's medical reviewers noted, there was no support, in terms of history and objective mental status findings, for the diagnosis of bipolar disorder.  Two of the three psychiatrists MetLife retained to review Crume's file (Drs. Kilburn and Kessler) expressly disputed that diagnosis, and the third (Dr. Schroeder) at least implicitly rejected it.  Moreover, as Dr. Kessler noted in his June 16, 2004 report to MetLife: "Treatment has consisted largely of symptom focused medication with very limited therapy and no treatment plan provided to address relevant occupational issues."  Kessler Report, A.R. 0158.  Further, Crume's psychiatric visits had decreased to once a month, suggesting that her mental condition was not severe enough to warrant frequent therapy and monitoring.

---

[14]Crume also maintains that MetLife denied her a full and fair review of her claim.  This argument merits no discussion except to say that it is evident from a review of the record that MetLife did afford Crume a full and fair review.

More significantly, irrespective of whether Crume suffered from bipolar disorder or, instead, major depression, the record is replete with evidence suggesting Crume retained sufficient functional ability to work in her occupation.  In that regard, Dr. Kessler noted that Crume's progress notes through 2003 "did not show impairments in memory, attention, concentration, or social interaction." *Id.,* A.R. 0157.  A mental status exam conducted by Dr. Esko Fisher in October 2003 "showed the claimant to be relevant, oriented, with no impairment of recent or remote memory, having normal speech, and dysphoric effect." *Id.*  Further, it was evident that Crume was able to engage in virtually the full range of normal activities of daily living.  In that regard, Crume reported that she was able to "care for herself, cook, drive, exercise, attend movies, eat in restaurants, walk, and care for her home." *Id.*  As Dr. Kilburn noted, Crume was "able to task shift, respond to others, maintain a schedule, make decisions, process information, and engage with the (at times unpredictable) needs of family members." Kilburn Report, A.R. 0099. Crume's ability to engage in these activities suggests that Crume retained sufficient coping skills and functional abilities to work in a sales position, even one involving considerable stress.

It is also significant that less than four months after Dr. Kessler reported that Crume could not "engage in stress situations or engage in interpersonal relations (marked limitations)," and that Crume could not return to work because she "cannot tolerate stress, time demands[,] fatigue [and] quotas," A.R. 0170, Crume had re-entered the work force as a sales consultant. This development either diminished significantly the accuracy of Dr. Berns' diagnosis and opinions concerning the severity of Crume's psychiatric condition, i.e., she was not as functionally impaired as Dr. Berns believed, or Crume's condition simply improved.

-24-

It is true that the position Crume assumed in February 2004 was an "inside" sales job; however, the record is not sufficiently developed concerning the relative stresses involved in these two positions for any meaningful comparison to be made between the two jobs. All that can really be gleaned from the record is that Crume believed the inside sales job to be less stressful, and that it paid less money than her former job. In any event, Crume's return to full-time employment as a salesperson suggests that Crume was not impaired to the degree that she could not work in her own occupation.

The Court thus finds, based on a *de novo* review, that MetLife's decision was not wrong.[15] Under the *Williams* approach, the Court need proceed no further in reviewing MetLife's decision. However, in the interest of thoroughness and to fully develop the legal issues in the event of an appeal, the Court will proceed to examine the remaining steps in the *Williams* analysis.

### B. Step Two: Was MetLife Vested With Discretion?

The Court determines that the Plan did vest MetLife with sufficient discretion to trigger the deferential arbitrary and capricious review standard. The Court rejects Crume's argument that the broader grant of discretion found at Plan A.R. 0042 is somehow not part of the Plan. "In order to determine the appropriate standard of review, a court is required to examine '*all* of the plan documents.'" *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003) (quoting *Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir. 1997)) (emphasis added).

---

[15]This means, of course, that even if the Court's decision to apply the arbitrary and capricious standard of review is incorrect, MetLife's decision must still be upheld under the less deferential *de novo* standard.

Equally without merit is Crume's argument that the two discretionary clauses conflict with each other.  In the Court's view, the two provisions complement, rather than conflict with, each other.  The fact that one clause does not go as far as the other does not place them in conflict.  Again, in reaching this conclusion, the Court considers the Plan as a whole.

Because the Plan vested MetLife with discretion, the Court will proceed to the next step in the *Williams* analysis.

### C. Steps Three and Four: Was MetLife's Decision Supported by Reasonable Grounds?

For the same reasons as this Court articulated in its discussion of the first *Williams* step, MetLife's decision was reasonable.  Before proceeding to the final *Williams* step, however, the Court will address two points raised by Crume.

The Court rejects Crume's argument that MetLife ignored the opinions of her treating psychiatrist, Dr. Berns.  It is settled that ERISA "plan administrators are not obligated to accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003); *see also Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1279-80 (11th Cir. 2005) (citing *Nord* for the proposition that "[g]iving more weight to the opinions of some experts than to the opinions of other experts is not an arbitrary or capricious practice").  In fact, courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Nord,* 538 U.S. at 834.  However, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*

In the present case, MetLife did not arbitrarily refuse to consider Dr. Berns' opinions. First, Dr. Berns' bipolar disorder diagnosis did not constitute "reliable evidence;" there was no objective support for that diagnosis. Second, it is abundantly clear that MetLife did consider Dr. Berns' diagnosis, but rejected it. It was within MetLife's province to do so. Although MetLife's final decisionmaker, Carole Roy, did testify that she relied on Dr. Kessler's report in reaching her claim denial decision, she also noted that the opinions of Crume's treating physicians were addressed in Dr. Kessler's report. Roy Deposition at 61-62. Roy was correct in that regard. *See* Kessler Report, A.R. 0157. Later in her deposition, Roy also testified that in reaching her decision, she considered "*[t]he complete record*, the plan document, the medical review. I also relied on the training I received and my knowledge of [E]RISA." Roy Deposition at 87 (emphasis added). Finally, in the June 18, 2004 claim denial letter, Roy stated: "We have reviewed your client's entire claim file;" she also discussed Dr. Berns' diagnosis of bipolar disorder and the deficiencies associated with that diagnosis A.R. 0154. These collective circumstances dispel any notion that MetLife acted arbitrarily in rejecting Dr. Berns' opinions.[16]

Similarly, the Court rejects Crume's contention that MetLife acted unreasonably with respect to the two job descriptions for Crume's outside sales position. The job description

---

[16]The Court also rejects Crume's argument that the conclusions of physicians who form their opinions based on review of a claimant's medical records are entitled to less deference than the opinions reached by physicians who actually examine the claimant. While other courts may hold that view, it does not appear to be the law in the Eleventh Circuit. *See Shaw v. Connecticut Gen. Life Ins. Co.,* 353 F.3d 1276, 1287 (11th Cir. 2003) (under *Nord*, district court erred in granting plaintiff summary judgment on basis that insurer acted unreasonably in rejecting opinions of examining physicians in favor of doctors who had only reviewed plaintiff's medical records).

allegedly not considered by MetLife's medical consultants was contained in a form entitled "Disability Claim Employer Statement." A.R. 0024-26. In Crume's view, that particular job description is the only one that accurately reflected the stressors associated with Crume's job. Crume focuses on the fact that the Employer Statement indicated that 100% of Crume's time in her outside sales job was attributable to "Interpersonal Relationships Necessary to Perform the Job," and 85% was attributable to "Stressful Situations Necessary to Perform the Job." A.R 0025.

For present purposes, the Court will assume that MetLife did not furnish the Employer Statement job description to its medical consultants. However, it is clear that MetLife did furnish each of those consultants with the other job description, entitled "Unisource Job Description." Each of the three consulting psychiatrists' reports lists "job description" among the documents reviewed. A.R. 0096, 0148A & 0157. Extended discussion of the Unisource Job Description is unnecessary; it suffices to say that it is evident from the requirements listed therein that the described position was demanding and would have necessarily involved a significant degree of interpersonal interaction and stress. *See* A.R. 0039-41. For example, in a section of the Unisource Job Description cataloging "Skills, Behaviors, Traits Needed for Job Success,"the following entry appears: "Self-directed, goal-oriented, and able to perform effectively in a highly competitive environment." A.R. 0040. This job description adequately conveyed the stress associated with Crume's position. The other job description was essentially cumulative.

In any event, it appears that Dr. Kessler, upon whose opinion MetLife based its final claim denial decision, did review documentation disclosing the contents of the job description

contained in the Employer Statement.  Among the documents Dr. Kessler stated he reviewed

was the May 24, 2004 appeal request letter Crume's attorney (Mark Nation) sent MetLife.  *See*

Kessler Report, A.R. 0157.  The following statement appears at page 4 of that letter:

> Ms. Crume was employed as an outside sales person.  *The job
> description, provided by her employer, indicates that 100% of
> the time it is necessary for her to be involved in inter-personal
> relationships in* order *to perform her job.  Moreover, 85% of the
> time she is involved in stressful situations at her occupation.*  In
> the Attending Physician's Statement ("APS"), signed by her
> treating psychiatrist, Dr. Berns, he indicates specifically that the
> patient is unable to engage in stress situations or to engage in
> inter-personal relations.  Moreover, he notes that she has low
> self-esteem, lacks confidence, and has difficulty concentrating
> in light of her depressed mood.  Moreover, he notes that she
> cannot tolerate stress, time demands or quotas.  *Again, as
> detailed in the Employer Statement, 100% of her job involves
> tasks which Ms. Crume cannot perform because of her disabling
> condition.*

A.R. 0108 (emphasis added).  Hence, although Dr. Kessler may not have seen the job

description contained in the Employer Statement, the information from that statement Crume

contends was critical to the question of whether she could perform her occupation was

contained in the May 24, 2004 letter from Crume's attorney to MetLife, which Dr. Kessler did

review.

Ultimately, the question before MetLife was not whether Crume could perform the

duties of the specific job she held at Unisource.  Rather, the issue was whether she was disabled

from her "Own Occupation," which was defined as "the activity that you regularly perform and

that serves as your source of income.  It is not limited to the specific position you held with

your Employer.  It may be a similar activity that could be performed with your Employer or any

other employer."  Unisource LTD Plan 0020.  The job description contained in the Employer's

Statement may have been relevant to that issue (albeit cumulative), but it certainly was not critical.

### D. Step Five: Did MetLife Operate Under a Conflict of Interest, Requiring Heightened Arbitrary and Capricious Review?

The Court rejects MetLife's argument that the subjective belief of MetLife's final decisionmaker, Carole Roy, that the Plan was funded by Crume's employer, rather than by MetLife, insulates MetLife from the heightened version of the arbitrary and capricious review standard.[17]   Injecting a subjective consideration of this type into the mix would frustrate application of the heightened review standard and would pose a significant potential for abuse on the part of claims administrators.   These considerations convince the Court that the subjective views of a claims decisionmaker concerning "who pays" have no place in the standard of review analysis.  *See HCA Health Servs. of Ga., Inc.,* 240 F.3d 982, 1007 n.53 (11th Cir. 2001) (indicating that conflict of interest issues should be analyzed through "objective means . . . namely - - economic analysis," rather than subjective motivations).  What matters is who *actually will pay* if a claim is approved.

Because MetLife served as both a decisionmaker and payer of claims, it operated under a conflict of interest.  Accordingly, the heightened version of arbitrary and capricious review applies.  The question is whether MetLife has satisfied its burden of proof and "purge[d] the taint of self-interest."  *HCA*, 240 F.3d at 1001.

---

[17]Roy's deposition is not a model of clarity on this point.  Portions of her deposition do indicate Roy thought the Georgia-Pacific plan, which was self-funded, applied to Crume's disability claim.  *See* Roy Deposition at 12-13, 50-51& 75.  However, Roy also testified that in reaching a decision on Crume's claim, consistent with her usual practice, she did not consider whether MetLife would be the payer if the claim was approved.  *Id*. at 75 & 93-94.

The Court finds that MetLife has done so.  In the first place, "the financial conflict here is relatively small, as the claims decision under review affect[s] one claimant only[.]" *Meyer v. Hartford Life & Acc. Ins. Co.,* 320 F. Supp. 2d 1256, 1265 (M.D. Fla. 2004).  Moreover, the administrative record contains no evidence of bad faith.[18] *Id.*  To the contrary, MetLife reached its decision on Crume's claim "after a thorough review of ample medical evidence in the administrative record" reflecting that Crume was not disabled.  *Id.* at 1266.  Additionally, "[i]t is obvious to this Court that it serves the benefit of the class of all participants and beneficiaries of the Plan when claims for LTD benefits are denied to employees who are able to return to work."  *Id.*  That is certainly the situation here.  In sum, under these collective circumstances, no reasonable fact-finder could conclude that MetLife acted out of self-interest in denying Crume's disability claim.

## VII.  CONCLUSION

For the foregoing reasons, MetLife's claim denial decision must be upheld. Accordingly, it is ORDERED as follows:

1.  Defendant Metropolitan Life Insurance Company's Motion for Summary Judgment (Doc. 52), filed October 3, 2005, is GRANTED.

---

[18]The Court gleans nothing sinister in the fact that MetLife ordered a second medical consultant review and prematurely upheld its initial claim denial after Crume's attorney wrote a letter requesting documents, but before he actually submitted an administrative appeal.  It appears this was a mistake, plain and simple.  MetLife rectified the problem when Crume's attorney brought the matter to the insurer's attention.  Moreover, rather than relying on the second medical consultant report, when Crume did perfect her administrative appeal, MetLife arranged for review by a third psychiatrist, Dr. Kessler.

2.   The Clerk shall enter a final judgment providing that the Plaintiff, Deborah N. Crume, shall take nothing on her claims against the Defendant, Metropolitan Life Insurance Company.  The judgment shall further provide that the Defendant shall recover its costs of action.

3.   Any other pending motions are moot.

4.   The Clerk shall close the case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on February 14, 2006.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Party